UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ZURI OSTERHOLT and MICHELLE BENIKOV, | |
| Plaintiffs, | No. 16 CV 5089 |
| v. | Judge Manish S. Shah |
| COREPOWER YOGA, LLC, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Zuri Osterholt and Michelle Benikov taught yoga classes for defendant CorePower Yoga, LLC, first as interns and later as instructors. They were paid for their time spent in the yoga studio, but plaintiffs say that when accounting for the time they were required to spend outside the studio preparing for each class, the equivalent hourly rate of their wages fell below the federal minimum. Plaintiffs brought claims against CorePower under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*, and the Chicago Minimum Wage Ordinance, Chicago, IL, Municipal Code, § 1-24-020. They want to pursue their federal claims as a collective action, and they now move to conditionally certify two classes—one for interns and one for instructors. For the following reasons, plaintiffs' motion is granted.

**I.  Legal Standards**

The Fair Labor Standards Act allows plaintiffs to recover unpaid minimum wages on behalf of a class of similarly situated employees in a collective action

against their employer. *See* 29 U.S.C. § 216(b). Unlike the class members in a Rule 23 class action, unnamed plaintiffs must opt in to be bound by an FLSA collective action. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013). Most district courts use a two-stage process for determining if named plaintiffs are similarly situated to class members with respect to whether an FLSA violation has occurred, such that a case may proceed as a collective action. *See, e.g., Jirak v. Abbott Labs., Inc.*, 566 F.Supp.2d 845, 847 (N.D. Ill. 2008) (collecting cases). In the first stage, plaintiffs must make a modest factual showing sufficient to demonstrate that "the putative class members were together the victims of a single decision, policy, or plan." *Id.* at 848 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). The purpose of the first stage is to determine whether any similarly situated class members exist. *See Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). If plaintiffs meet their burden, then they may send notice to potential class members, giving those individuals the opportunity to opt in to the collective action. *See id.*

In the second stage, after the opt-in plaintiffs are identified and discovery is complete, defendants may move for decertification. Plaintiffs then must meet a higher standard for the collective action to proceed, and courts generally consider three factors: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Mielke v. Laidlaw Transit, Inc.*, 313 F.Supp.2d 759, 762

(N.D. Ill. 2004). Ultimately, the standard for proceeding as a collective action is no different from the standard for certifying a class action under Federal Rule of Civil Procedure 23. *See Espenscheid*, 705 F.3d at 772.

CorePower argues that, because the parties have conducted limited discovery, the flexible, lenient standard typically applied at the first stage should be heightened to a standard more stringent than the lenient standard but less stringent than the second-stage, post-discovery standard. Plaintiffs object to this approach, as they filed this motion early in the case and, at the time, the parties' discovery efforts were limited to information necessary to meet the lenient standard. Since then, however, the two named plaintiffs and a third-party witness were deposed, the parties submitted multiple declarations from other CorePower employees, and CorePower produced over 10,000 documents. Plaintiffs were given the opportunity to file both a reply and a sur-surreply with much of that discovery in hand. The limited discovery conducted so far is sufficient to warrant an intermediate standard. Like other courts that have applied such an intermediate standard to conditional certification, I consider the evidence put forth by both parties but remain mindful of the fact that CorePower has greater access to evidence than plaintiffs. *See, e.g., Steger v. Life Time Fitness, Inc.*, No. 14-CV-6056, 2016 WL 245899, at *2 (N.D. Ill. Jan. 21, 2016); *Bergman v. Kindred Healthcare, Inc.*, 949 F.Supp.2d 852, 856 (N.D. Ill. 2013).

**II. Background**

Plaintiffs Michelle Benikov and Zuri Osterholt trained to be yoga teachers by enrolling in and completing a training program administered by defendant CorePower Yoga, LLC. [54-3] at 11, Tr. at 43:7–16; [54-4] at 8, Tr. 29:9–30:2.[1] After completing their training, they joined the CorePower internship program, which required that they teach 30 yoga classes and qualified them to be CorePower instructors. *See* [37-10]. Benikov began the internship program in Chicago in November 2011, and taught her 30th class in January 2012. [54-3] at 11–12, Tr. at 43:17–45:22. Osterholt taught classes as an intern in Chicago from June 15, 2015 until August 9, 2015. [37-1] ¶ 2. Following their internships, Osterholt and Benikov worked for CorePower as instructors. Osterholt worked in Chicago from August 10, 2015, until February 4, 2016. *Id.* Benikov started out in Chicago but later moved to Portland, Oregon, working as an instructor there from November 2014 to January 2016. [37-2] ¶ 4. In addition to teaching yoga classes, Benikov also trained new CorePower teachers in both cities. [37-2] ¶ 10.

There is some evidence that CorePower teachers nationwide received the same training, using a standardized training manual. [54-2] at 21, Tr. at 82:14–82:22. In their training, plaintiffs learned that preparing for each class included developing and memorizing a choreography and sequence of yoga poses, the verbal cues they will use to lead students into the next pose, the type of physical assistance students may require for each pose, and the music to be played during the class.

---

[1] Bracketed numbers refer to entries on the district court docket.

4

[54-3] at 43, Tr. at 169:19–170:17; *id.* at 93, Tr. at 369:14–371:14; [54-25]. It was also their responsibility to develop a theme to which each of these class components related. [54-18]–[54-20].

The standard instructor employment agreement defines an instructor's essential job duties, one of which is as follows: "Provide superior yoga instruction by teaching CorePower Yoga classes, adhering to CPY sequencing expectations, structure, and quality standards at all times." [37-14]. The agreement also requires that instructors provide students with individual assistance as appropriate, interact with them before and after each class, and promote additional CorePower trainings and classes. *Id.* And it directs instructors to "[c]omply with expectations for classroom environment, teacher substitution, format structure, and other guidelines" provided in other CorePower documents and communications. *Id.* Teaching manuals and other documents sent to teachers say that each class should provide a "World Class Experience," [54-15], and that "no two classes will be exactly the same." [54-17]. To aid the teachers in preparing for their classes, CorePower regularly circulated sample playlists and suggested themes. [49-15] ¶ 13; [54-4] at 48, Tr. at 191:3–192:18.

According to CorePower's standard intern and instructor employment agreements, CorePower also required interns and instructors to work at the front desk for thirty minutes before and after each class they taught. *See* [37-10], [37-11]. The CorePower employee manual states that while staffing the front desk, employees had to interact with students, market additional classes and training

5

programs, and perform other non-teaching activities as required by the studio manager. [54-13]. Benikov testified that, in her training in Chicago, she was explicitly informed of a policy prohibiting class preparation while at the front desk, and that she in turn informed others of that policy while training teachers in Portland. [54-3] at 68–70, Tr. at 271:4–279:3. Plaintiffs also testified that CorePower required interns and instructors to spend time marketing their classes on social media and reviewing newsletters and email announcements from CorePower. [54-3] at 60, Tr. at 237:23–238:11; *id.* at 98, Tr. at 389:1–390:4. And if an intern or instructor could not teach a scheduled class, he had to solicit a substitute teacher via email. [54-32]. CorePower also provided the following instruction: "If you ask for a sub, return the Karma and sub for someone else when you are able." *Id.*

Osterholt testified that she spent an average of four hours preparing for each class. [54-4] at 43–44, Tr. at 172:4–173:9. Benikov testified that she spent between four and five hours preparing for each class. [54-3] at 102, Tr. at 407:4–13. Third-party witness Fitzgerald, a former studio manager, said she spent anywhere from three to five hours before each class preparing. [54-2] at 14, Tr. at 54:3–20. In their declarations, Osterholt and Benikov stated that CorePower paid them below all applicable minimum wages, but do not provide more detail than that. *See* [37-1] ¶ 12; [37-2] ¶ 19. And according to plaintiffs and Fitzgerald, their managers had some awareness of how much time and effort were required to prepare for a class.

[54-2] at 11–12, Tr. at 44:7–45:22; [54-3] at 47, Tr. at 186:4–187:9; [54-4] at 55–56, Tr. at 220:16–221:16.

Fitzgerald also testified, based on her experience as a studio manager and her attendance at corporate meetings, that CorePower paid interns and instructors only for their time spent in the studio—either teaching a class or managing the front desk before and after their classes—and not for any time spent working outside the studio. [37-3] ¶¶ 5–9. Plaintiffs provide CorePower documents related to the payroll system that directed interns and instructors to record their time spent working at the front desk before and after each class—one hour total—and their time spent actually instructing each class—generally, one more hour—, but do not mention time spent preparing for classes. *See* [54-9], [54-10]. Plaintiffs' payroll records reflect that for the vast majority of classes they taught, CorePower explicitly compensated them for two hours of work time. *See* [54-11], [54-12].

According to plaintiffs, CorePower paid all of its interns for the time they report at an hourly rate equal to the minimum wage applicable to each jurisdiction in which they work. [37-2] ¶ 12. CorePower paid Osterholt between $8.25 and $10.00 per hour reported when she worked as an intern. [19] ¶¶ 38–39. CorePower paid instructors on a per-class basis; Osterholt received $30 per class when she worked as an instructor, and Benikov received $38.50 per class. [19] ¶¶ 45–46.

Osterholt seeks to represent a class of interns and proposes the following class definition: "all persons who have been employed by CorePower Yoga as interns throughout the United States, from three years prior and up through the date the

order granting conditional certification is entered."[2] [37] at 6. Both Osterholt and Benikov seek to represent an instructor class, consisting of "all persons who have been employed by CorePower Yoga as instructors throughout the United States, from [three] years prior and up through the date the order granting conditional certification is entered." *Id*. CorePower employed over 3,700 interns and instructors in the last three years. [49-2] ¶ 4.

## III. Analysis

### A. Conditional Certification

Plaintiffs make a modest factual showing that they and the rest of the putative class members are similarly situated, because they were subject to the same practices and policies requiring them to perform certain tasks off-the-clock which, in the case of named plaintiffs and others, may have resulted in payment below the federal minimum wage. CorePower paid all of its interns nationwide at an hourly rate and paid its instructors a fixed amount per class. For both interns and instructors, CorePower accounted for the time spent instructing a class, and for time spent at the front desk before and after each class, where they were required to interact with students and market additional classes or training programs. But CorePower also directed interns and instructors across the country, in their training courses and in various manuals and newsletters, to perform certain tasks in preparation for each class they were to instruct, and to review emails related to substitution requests or corporate announcements. CorePower did not separately

---

[2] Because Benikov's time as an intern ended more than three years ago, she cannot be a member of the intern class.

8

compensate its teachers for the time spent performing those duties. Plaintiffs submit evidence of those nationwide policies in the form of their declarations and deposition testimony, standard employment agreements, training documents, and corporate newsletters. Plaintiffs also submit declarations of five other current and former CorePower interns and instructors, who taught different types of CorePower classes at different studios and shared plaintiffs' understanding of CorePower's policies.[3] *See* [37-3]–[37-7]. Plaintiffs testified that they spent a significant amount of time outside the studio performing that additional work, and that their managers were aware of the significant time commitment required for those tasks, though there is no evidence to suggest that either plaintiffs or their managers knew the precise number of additional hours worked. Plaintiffs do not claim that spending time working outside the studio necessarily entitles them to relief. Rather, plaintiffs' theory of liability rests on their contention that, when accounting for the time spent on additional tasks, CorePower paid them less than $7.25 per hour in violation of federal law. *See* 29 U.S.C. § 206. Plaintiffs testified that they spent between three and five hours preparing for each class which, based on their wages, places them below the federal minimum wage. Plaintiffs therefore meet their modest burden in showing that they and the rest of the putative class members were subject to a policy that resulted in plaintiffs, and perhaps others, being paid below minimum wage.

---

[3] CorePower discounts these declarations because most reflect the experiences of employees in the Chicago area, but CorePower does not provide any evidence to suggest that its compensation policies or the duties of interns and instructors differ by region.

CorePower's primary argument is that the corporate policies identified by plaintiffs were vague directives that were open to interpretation and did not explicitly require substantial preparation time, and that certification would require individualized analysis of each class member. CorePower believes that plaintiffs' subjective interpretations of their job responsibilities are to blame for any uncompensated work time.[4] For example, CorePower does not dispute that it required teachers to prepare for their classes by performing certain tasks like developing themes and music playlists. Nor does it dispute that it told its teachers in newsletters and teaching manuals that they should provide a "World Class Experience," and that no two classes will be exactly the same. But CorePower insists that interns and instructors would have been reasonable in interpreting those statements to require making minor changes to each class with minimal effort. Moreover, CorePower submits that the variety of those interpretations was likely compounded by the decisions and directions of individual studio managers. Liability may also turn on the abilities and personal preferences of individual

---

[4] The parties focus on the nature of the work that CorePower required its instructors and interns to perform, rather than the practice of consistently compensating them for roughly two hours per class. CorePower notes that its employee manual explicitly instructs its employees to accurately record their hours and prohibits them from working "off the clock." *See* [49-4] at 3. But testimony in the record suggests that that policy was not enforced. Plaintiffs testified that teachers were compensated for only in-studio time (generally two hours), regardless of the work they performed outside of the studio. And it is worth noting that declarations submitted by CorePower are consistent with plaintiffs' testimony—they describe a compensation policy that accounted for only in-studio time while conceding the possibility that they spent at least a nominal amount of time working outside of the studio. *See, e.g.,* [49-19] ¶ 5 ("Interns and instructors are paid for two hours of work time per class. This includes class time (which is generally one hour), as well as up to a half-hour of time before and after class."); *id.* ¶ 7 ("I generally spend only nominal amount of time, if any, outside of the studio preparing for class.").

interns and instructors. From a procedural standpoint, CorePower argues that the need for and applicability of individualized evidence and defenses make a collective action an inefficient method of resolving these claims.

CorePower's concerns have some merit. Wages varied among the putative class members, and many of them, like plaintiffs, were paid more than minimum wage for the time that CorePower does account for—time spent in the studio during class or at the front desk. Whether an employee's average hourly rate dropped below minimum wage depends on that employee's actual wage, his own interpretation of what his duties were, and how efficient he was at performing those duties. CorePower points out that an instructor earning the same wage as Benikov would have to work more than three hours outside the studio for every class she taught in order for her average hourly rate to fall below the minimum wage. Of course, Benikov testified that she did spend more than three hours preparing for each class, but CorePower submits declarations from nearly 20 teachers and former teachers who testified that their hourly rate, averaged over any given week, would not entitle them to relief. Those employees stated in their declarations that they did not interpret CorePower's directives as requiring them to develop a new sequence of poses or assemble a new music playlist for every class. Instead, they made small changes every few classes, or on a weekly or monthly basis. They also spent less time than plaintiffs did on theme development, and some were able to come up with themes, verbal cues, and physical assists on the fly, rather than planning them out before each class. They prepared for classes during their front-desk time, with only

11

a minimal amount of additional time spent outside the studio, and some spent less time on class preparation as they became more experienced. They also fulfilled substitution requests when they wanted more work, but did not interpret CorePower's substitution policy as a mandate to review every email request they received. CorePower believes that the declarants, who worked at different studios across the country, demonstrate the variability inherent in plaintiffs' theory of relief.

The discretionary acts of CorePower's studio managers present another variable to consider and contribute to the potential heterogeneity of the proposed classes. Some of the declarations submitted by CorePower are from former instructors who became studio managers and whose individual decisions may have disqualified their employees from plaintiffs' proposed classes. Several testified that they told instructors to prepare for classes while sitting at the front desk, that they explicitly advised new instructors against changing sequences too frequently, and that they required that instructors stay at the front desk after class only until the last student leaves, even if thirty minutes had not yet passed. *See, e.g.,* [49-13], [49-35]. CorePower notes that, in her deposition, even Osterholt conceded that some job responsibilities varied by studio and studio manager. CorePower says that the people included in the class definitions—3,700 instructors and interns who worked in 120 different studios in 18 states—are too diverse, and liability and damages depend on too many variables specific to each individual, such that resolving plaintiffs' claims would require individualized findings of liability and

determinations of damages. And if that were true, then post-discovery decertification is all but inevitable, and sending notice to the classes would be a waste of resources.

Liability and damages might ultimately depend on a variety of individualized factors, but it is still too early in the case to make that determination. Plaintiffs have not had the opportunity to depose a corporate representative of CorePower or the employees who submitted declarations on its behalf. It is possible that further discovery will reveal that many teachers put in enough time outside the studio to bring their pay below the minimum wage, and that CorePower expected or encouraged such behavior. Even though certain studio managers said in their declarations that they set their own requirements related to front-desk time, their statements directly contradict CorePower's employee manual. The variability they introduce militates against proceeding as a collective action, but it cannot be said, based on the current record, how much of a concern they present. It may be that the vast majority of studio managers do not deviate from CorePower's corporate policies, and that they do not actively discourage intense class preparation, in which case their discretion would play no role in whether CorePower's policies resulted in an FLSA violation. The written directives identified by plaintiffs are vague, and assessments of quality vary by individual, but plaintiffs demonstrate that, through its training program and corporate communications, CorePower established certain expectations that may have been interpreted with some degree of consistency by other interns and instructors.

CorePower also notes that plaintiffs did not keep track of the additional time they spent working outside the studio and were able to provide general estimates of total time spent, but not hourly breakdowns of that time by task. But with the benefit of further discovery, plaintiffs may be able to prove their claims on behalf of the classes using representative discovery. The credibility of plaintiffs' claims of extensive off-the-clock work—which CorePower has some basis to challenge—is also better tested at a later stage. CorePower draws a comparison between the factual scenario presented here and that described in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), where the court affirmed decertification of a collective action class because the plaintiffs had failed to provide sufficiently representative evidence to establish liability for the class. *Id.* at 776–77. Some of the problems identified by *Espenscheid* may loom on the horizon. For example, the plaintiffs in that case argued that all employees were paid for each assignment they completed, but did not report all of the time spent working. *Id.* at 773–74. And the court noted the difficulty of compensating each employee fairly when they had no record of their time spent working, and that time was dependent on a number of individualized factors like each employee's efficiency. *Id.* at 774–75. But the court did not reject out of hand the use of a collective action when faced with such a scenario. It rejected the plaintiffs' showing of proof, after they had the opportunity to identify an opt-in class, pursue discovery, and flesh out the relevant issues. It was at the second stage that the class was decertified, and the court explicitly noted that, in theory, representative evidence could be used "to enable[] the trier of fact to draw a 'just

14

and reasonable inference' concerning the amount of time the employee had worked." *Id.* at 775 (citing *Urnikis–Negro v. American Family Prop. Servs.*, 616 F.3d 665, 669 and n.2 (7th Cir. 2010)). Plaintiffs here do not put forth the type of representative evidence that the Seventh Circuit envisioned. Nor do they have to at this stage of the litigation. Instead, they explain that they plan to introduce representative evidence to establish how much work was required outside the studio per class, and to determine, based on payroll records, which opt-in members would be entitled to relief. The sufficiency of their evidence will be examined once they have presented it.

Both sides cite to other district court decisions in support of their arguments, but the fact-specific nature of this type of case limits their value. District courts have wide discretion in administering collective actions, *Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) (citing *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989)), so some degree of inconsistency is to be expected. If the individual issues and case management concerns identified by CorePower do develop, and the classes turn out to be "hopelessly heterogeneous," *Jonites v. Exelon Corp.*, 522 F.3d 721, 725 (7th Cir. 2008), then decertification will follow. But that decision will be reserved for a later date, when the parties have a better sense of what the class looks like and what the facts are. Conditional certification will undoubtedly increase the costs of this litigation, *Woods v. New York Life Insurance Co.*, 686 F.2d 578, 581 (7th Cir. 1982), but plaintiffs make the necessary factual showing, considering the discovery taken so far, that there exists a group of

15

employees who were subject to a common policy that caused them to be paid less than the minimum wage. Putative class members should be notified of this action "so that they can make informed decisions about whether to participate." *Hoffmann–La Roche*, 493 U.S. at 170. The motion to conditionally certify the intern and instructor classes is therefore granted.

**B.     Notice**

Plaintiffs want to notify potential opt-ins by both U.S. mail and email, and they propose a 90-day notice period. They say that most interns and instructors are young and do not have permanent housing, and that supplementing mail notice with email notice is likely to substantially increase exposure. They also argue that a 90-day notice period is necessary in case they run into difficulties tracking class members down. I agree. Both methods of delivery may be used, and recipients are allotted 90 days to opt in. Plaintiffs also seek authorization to send out reminder emails and to hang posters in CorePower studios. But plaintiffs do not explain how posters would reach any current or former interns or instructors that mail and email would not, and there is no need to notify potential opt-ins more than once. Plaintiffs' request for the authorization of reminder emails and posters is denied.

The parties dispute the form of the notice to be sent out to potential opt-ins. CorePower worries that plaintiffs' proposed notice might be mistaken for judicial sponsorship and an endorsement of the merits of plaintiffs' claims. It invokes *Woods v. New York Life Insurance Co.*, 686 F.2d 578 (7th Cir. 1982), in which the Seventh Circuit raised the same concerns and warned against the issuance of notice on a

court's letterhead. *Id.* at 581. Unlike the notice proposed in *Woods*, however, the proposed notice here includes an appropriate disclaimer: "This notice and its content has [sic] been authorized by the United States District Court for the Northern District of Illinois, the Honorable Manish Shah, United States District Court. The court has made no decision in this case about the merits of plaintiffs' claims or defendant's defenses." That should be enough to minimize the appearance of a judicial endorsement of plaintiffs' claims.

CorePower also wants to include in the notice warnings about opt-ins' potential discovery obligations and the possibility that opt-ins will be partly responsible for CorePower's costs if CorePower prevails.[5] Plaintiffs argue that such warnings might have a chilling effect. Disclosing how opt-ins may be required to participate in the lawsuit is fair and will allow them to make an informed decision about joining the suit. The notice will include the following sentence: "If you join this lawsuit, you may be required to provide information, sit for a deposition, or testify in court." But I agree that a reference to cost-shifting—an event of unknown likelihood—would unnecessarily deter participation. The parties shall meet and confer on a revised notice that is consistent with this opinion. Objections, if any, will be resolved at the next status hearing.

---

[5] CorePower also requests the inclusion of an accurate description of the lawsuit and CorePower's position, but it does not actually say that the proposed descriptions are inaccurate. Its request is therefore denied.

17

## IV. Conclusion

Plaintiffs' motion for conditional certification, [36], is granted. CorePower shall disclose to plaintiffs identifying information on the class by June 8, 2017. The parties shall file a status report with a proposed case schedule (to include proposed deadlines for the close of discovery, dispositive motions, and motions for class certification and decertification of the collective action) and any new objections to the notice by June 15, 2017. A status hearing is set for June 29, 2017 at 9:30 a.m.

ENTER:

/s/ Manish S. Shah

Manish S. Shah
United States District Judge

Date: May 18, 2017